# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CR421-197 |
| | ) | |
| DONTRAY LEWIS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Defendant Dontray Lewis is charged with Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. § 922(g)(1).  Doc. 1 (Indictment).   He has moved to suppress (1) a Glock pistol; (2) incriminating statements; and (3) DNA obtained via a search warrant. Doc. 26.[1]  The government opposes his motion.  Doc. 27.  The Court held an evidentiary hearing on May 17, 2022.  Doc. 38 (Minute Entry).  The motion is ripe for disposition.

---

[1]  Defendant initially filed his Motion to Suppress on January 24, 2022.  Doc. 22.  He then filed an Amended Motion to Suppress on February 25, 2022.  Doc. 26.  His counsel confirmed during the hearing that the Amended Motion to Suppress supersedes the initial motion.  Therefore, the Clerk is **DIRECTED** to dismiss the Motion to Suppress at docket entry 22 as withdrawn.

## I.     BACKGROUND

The charge against Lewis stems from a May 15, 2020, traffic stop conducted by officers with the Savannah Police Department, including Officer Lucas Hinds, who testified during the hearing.   Doc. 38. According to his testimony, he and his partner, Officer Keel, were patrolling in a marked police unit when they were advised by another officer, Officer Blair, that a dark colored drop-top convertible, driven by a black male wearing a light-colored t-shirt, had fled from him.  Hinds further explained that Officer Blair's "be on the lookout" broadcast, or BOLO, included information about the vehicle travelling at a high rate of speed such that Blair could not identify the license tag or activate his lights and sirens.  Approximately ten minutes later, Hinds and Keel saw a Mustang convertible which appeared to match the description provided by Blair.  They later learned that the vehicle's driver was the defendant, Dontray Lewis.

After Keel and Hinds identified Lewis' vehicle, Keel, who was driving the police unit, pulled behind Lewis.  The officers then observed Lewis make an improper right turn onto Victory Drive, turning into the far lane instead of the lane closest to the curb, which Hinds testified he

understood to violate Georgia law.  Based on their observation of that traffic violation, the officers decided to initiate a traffic stop.  Keel activated the lights and sirens, after which Lewis' vehicle traveled a couple of blocks, turned onto a side street, and pulled over.

Hinds approached the passenger side of the car, while Keel approached the driver's side.  Keel informed Lewis that they had pulled him over for his improper turn, and that he appeared to match the description of a driver that had "fled" from another officer.  Hinds was on the passenger side of the Mustang, observing both the female passenger and Lewis.  The officers' interactions with Lewis and his passenger were captured on each officer's body worn camera.  *See* docs. 38 & 38-1.  Video footage from each camera was admitted into evidence during the hearing.

Hinds testified that after the officers approached the car, the driver, Lewis, appeared to be agitated.  Hinds identified what he believed to be a holster on Lewis' right hip.  Although he did not identify a firearm in the holster, it roused his suspicion that a firearm might be in the vehicle. He then signaled to his partner, Officer Keel, the potential presence of a firearm.  Keel asked Lewis if he had a firearm, and Lewis responded that he did not.  Hinds then directly asked Lewis about the black plastic clip

on his hip and directed Lewis to his right hip using his flashlight. Lewis appeared to Hinds to intentionally avoid looking at that area, holding his hands up and looking around the compartment of the vehicle in a confused manner. Hinds became more direct in describing the black plastic clip, at which point Lewis still avoided looking at the area Hinds was describing. Hinds, becoming more suspicious, asked Lewis to put his hands on the steering wheel. *See,* Gov't Exhibit 2 (footage from Officer Hinds' body worn camera).

Officer Blair then arrived on the scene. Blair confirmed that Lewis' vehicle was similar to the vehicle he had seen earlier, but could not definitively identify Lewis or the Mustang as the earlier offender. Once Blair was on the scene, Keel asked Lewis to exit the vehicle. Lewis, appearing very agitated, refused. *See* Gov't Exhibit 3 (footage from Officer Hinds' body worn camera). Hinds testified that the officers asked Lewis to exit the vehicle to investigate the suspicion of a possible firearm, considering the appearance of what Hinds believed to be a gun holster and what he described as Lewis' deceptive behavior. Hinds estimated that officers spent four to five minutes talking to Lewis, including asking him to exit the vehicle, before they decided to forcibly remove him.

Eventually, Officer Blair opened the door to the vehicle and Hinds moved around to the driver side to assist in removing Lewis from the driver's seat. Hinds asked Lewis once more to exit the vehicle, and he again refused. After a struggle, Lewis was removed from the car and placed under arrest for obstruction. During a search incident to that arrest, officers confirmed the presence of a black holster on Lewis' hip. *See* doc. 38-2 (photograph of items removed from Lewis after arrest, including holster).

While officers were taking Lewis into custody, Hinds observed the female passenger, later identified as Robin Walker, inside the passenger compartment of the vehicle, appearing to search for something. He alerted Keel, who instructed the passenger to get out of the vehicle. She did not comply, so he again instructed her to get out of the vehicle. *See* Gov't Exhibit 4 at 7:40-7:50 (footage from Officer Keel's body worn camera). She eventually complied. *See id.* at 7:50-8:00; *but see id.* at 9:40-9:50 (additional warnings to Walker to stay behind the vehicle).

Hinds testified that after confirming Lewis had been wearing a holster, he determined that the officers needed to investigate the existence and location of the suspected firearm and, if necessary, render

5

it safe.  Officer Blair began searching the vehicle while Hinds stayed with the passenger.   Keel investigated Lewis' criminal background and discovered that he was a felon.  Blair's search revealed a Glock magazine and ammunition in the driver's compartment of the Mustang, and informed Hinds of his discovery.

Hinds also testified that Walker was acting suspiciously, trying to conceal her purse from him.  Based on safety concerns arising from the presence of the holster, Hinds asked Walker if he could search her purse. She became defensive and refused.  Hinds began to lead her towards the police vehicle and she pulled away.  She was then placed under arrest for obstruction.  *See* Gov't Exhibit 1 at 11:50-12:40 (footage from Officer Hinds' body worn camera).  Pursuant to a search of her purse incident to that arrest, Officer Blair located a firearm.  *See* Gov't Exhibit 6 (footage from Officer Keel's body worn camera).

Meanwhile, Lewis, already in custody for his obstruction arrest, was in handcuffs in the back of the police vehicle.  He had not yet been provided his *Miranda* warning.  Hinds, unable to find any identification for the female passenger, and after unsuccessfully asking her for her name, entered the front passenger seat of the police unit and asked Lewis

for her name.  Lewis provided her name.  He also appeared to ask a question, inaudible in the recording, about Walker, to which Hinds responded: "She did actually, and that's unfortunate for her."  Lewis responded, "What she did?  She didn't do nothing bro, I made her."  *See* Gov't Exhibit 8 (footage from Hinds' body worn camera).  After additional back-and-forth, he made another incriminating statement related to the gun.

The defendant was ultimately arrested and booked for the initial traffic violation, obstruction, illegal possession of the firearm, and possession of stolen property.  Walker was released with a subpoena for her misdemeanor obstruction charge.  A detective later applied for, and received, a search warrant for Lewis' DNA.  *See* doc. 38-3.  His affidavit in support of the search warrant was based on the traffic stop.  *Id.* at 5. Lewis was later indicted on the current charge.  Doc. 1.

Lewis seeks suppression of the firearm found in Walker's purse, incriminating statements he made after his arrest but before receiving his *Miranda* warning, and DNA obtained pursuant to the search warrant.  Doc. 26.

## II.   ANALYSIS

### 1.   Stop and Search of the Car

Lewis first argues that all the evidence found should be suppressed because the officers "effectuated the stop under false pretenses and lacked reasonable suspicion to support the stop."  Doc. 26 at 7-10.  He argues that the prior flight did not provide officers with a basis to stop the car, because the flight never occurred.  *Id.* at 8-9.  He also argues that the officers' justification for the stop—failure to maintain lane—is pretextual and he was instead stopped because of his race.  *Id.* at 9-10. The government responds that the stop was lawful, and therefore any evidence discovered during the stop should not be suppressed.

"Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution."  *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983).  To carry its burden, the government relies on Hinds' credible and unequivocal testimony that he and Officer Keel stopped Lewis' vehicle because they witnessed him making an illegal turn.  "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe a traffic

violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Even violation of a minor traffic offense can support a traffic stop. *See id.* at 818 ("[W]e are aware of no principle that would allow us to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness of enforcement.").

Defendant challenges the stop based on the officers' explanation that he matched a car that had "fled" from Officer Blair earlier in the evening. *See* doc. 26 at 8-9. He argues that, based on Blair's own description of the earlier incident, the car Blair observed did not commit unlawful flight under Georgia law. *Id.* (citing O.C.G.A. § 40-6-395). Defendant is right; the Government concedes the matter. Officer Blair did not witness an unlawful flight since he never initiated his lights or siren. However, that does not render the officers' stop of Lewis' car improper. Officer Hinds testified that, at the time they stopped Lewis' car, they believed it to match the description of the car that Officer Blair had witnessed driving at a high rate of speed, itself a traffic violation.

An investigatory stop must be supported by "reasonable suspicion to believe that criminal activity may be afoot," which is determined based

on the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Although officers cannot rely on "mere hunch," the likelihood of criminal activity need not rise to the level required for probable cause, or the preponderance of the evidence standard. *Id.* at 274; *see also United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007). In addition to probable cause for the actual traffic violation witnessed by Hinds and Keel, they had reasonable suspicion that Lewis had committed the traffic violation observed by Blair, and therefore had a "particularized and objective basis for suspecting legal wrongdoing." *Lindsey*, 482 F.3d at 1290.

Once the officers lawfully stopped Lewis' car, they were entitled to ask him to exit the vehicle. *United States v. Knight*, 562 F.3d 1314, 1327 (11th Cir. 2009) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977)). "[I]t is well-settled that an officer may direct a driver to get out of the car during a lawful traffic stop." *United States v. Burwell*, 763 F. App'x 840, 850 (11th Cir. 2019). Evidence presented during the hearing demonstrates that Hinds saw what he believed to be a holster. The evidence further shows that Lewis, when directly asked about the apparent holster, acted confused, evasive, and intentionally avoided

looking at the item on his right hip.  Therefore, the officers were within their authority to ask him to step out of the vehicle.  Lewis refused the officers' clear commands to get out of the car.  At that point, the officers had probable cause to arrest him under Georgia's misdemeanor obstruction statute.  *See* O.C.G.A. § 16-10-24(a).  A search incident to that arrest confirmed the presence of the holster.

After Lewis was arrested, Officer Blair conducted a search of the passenger compartment of the open convertible.  Based on the presence of the holster, Lewis' deception about that holster, and the passenger's attempts to re-enter the vehicle after being told not to, officers believed the firearm to be located within the vehicle.  At that point, Officer Keel had independently determined that Lewis was a felon, and therefore prohibited from carrying a firearm.  The law is well-settled that law enforcement officers who lawfully stop a motor vehicle may proceed to conduct a warrantless search of that vehicle where they have probable cause to believe that it contains evidence of criminal activity.  *See, e.g., Carroll v. United States*, 267 U.S. 132, 153 (1925).  This "automobile exception" to the Fourth Amendment "does not have a separate exigency requirement: 'If a car is readily mobile and probable cause exists to

believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.' " *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)); *see also United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003). Lewis' car was readily mobile because it was operational, *Watts*, 329 F.3d at 1286, and officers had probable cause to believe it contained evidence of criminal activity—a firearm that Lewis was prohibited from possessing based on his status as a felon.

The government has carried its burden of demonstrating that the stop and search of the car were reasonable.  Lewis' motion to suppress evidence based on the argued illegality of the traffic stop should be **DENIED**.

## 2.    Search of Walker's Purse

Not only does the Government argue, correctly, that the traffic stop was supported by the requisite suspicion under the Fourth Amendment, it also argues that Lewis lacks "standing" to challenge the seizure of the gun from Walker's purse. *See* doc. 27 at 6-7. "In order to have evidence suppressed based on a violation of the Fourth Amendment, a claimant has the burden of proving . . . that the claimant had a legitimate

expectation of privacy." *United States v. McKennon*, 814 F.2d 1539, 1542 (11th Cir. 1987) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)). To make the required showing, the individual must demonstrate a "subjective expectation of privacy in the object of the challenged search," and that "society [is] willing to recognize that expectation as legitimate." *Id.* at 1542-43. "An individual's Fourth Amendment rights are not infringed—or even implicated—by a search of a thing or place in which he has no reasonable expectation of privacy." *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020).

The Government contends that Lewis had no reasonable expectation of privacy in either his companion's purse or the firearm that he denies possessing. Doc. 27 at 6-7. It cites to cases from other courts finding that a "defendant can claim no legitimate expectation of privacy in his companion's personal containers, such as purses or pocketbooks." *Id.* at 7 (citing *United States v. Rusher*, 966 F.2d 868 (4th Cir. 1992); *Mabra v. Gray*, 518 F.2d 512, 513 (7th Cir. 1975); *United States v. Glaspie*, 993 F. Supp. 448 (W.D. La. 1998)). A review of these cases finds that they support the Government's argument.

During the hearing, the defendant argued that, because the pending charge is a possessory offense, he need not establish that his own Fourth Amendment rights had been violated by the search and seizure of the gun, only that the search itself was unconstitutional. *See United States v. Salvucci*, 448 U.S. 83, 87-89 (1980). The Government was afforded seven days to respond directly to this argument, *see* doc. 38 at 1, but did not submit any additional briefing. Nevertheless, the Court's own review of *Salvucci* indicates that it does not support the defendant's argument. The Supreme Court in *Salvucci* rejected the "automatic standing" rule that it had, in the past, applied. 448 U.S. at 89-95. A defendant charged with a possessory offense must still "demonstrate, if [he] can, that [his] own Fourth Amendment rights were violated." *Id.* at 95. Lewis has not presented any evidence or argument as to why he had a reasonable expectation of privacy in his passenger's purse. Instead, the evidence from the hearing, including the video footage and Hinds' testimony, shows that the passenger held onto the purse and indicated to the officers that it was her purse. Therefore, to the extent Lewis seeks to suppress the gun found in Walker's purse, his motion should be **DENIED.**

### 3.     Incriminating Statements

Lewis also seeks suppression of incriminating statements made after his arrest but before receiving *Miranda* warnings, arguing they were elicited in violation of the Fifth Amendment.  Doc. 26 at 10-11.  The government concedes that the challenged statements "were made prior to *Miranda* and after Defendant was in custody."  Doc. 27 at 18.  The Government also concedes that the second challenged statement ought to be suppressed.  *Id.* at 19.  It argues, however, that Lewis' statement "What she did?  She didn't do nothing bro, I made her" falls into an exception to the *Miranda* rule, since it was an unsolicited response to a "routine booking question."  *Id.* at 18.

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  "Interrogation . . . means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United  States v. Gomez*, 927

F.2d 1530, 1538 (11th Cir. 1991) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).  The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda* and were otherwise voluntary, or that some exception to the *Miranda* rule applies.  *United States v. Chaidez-Reyes*, 996 F. Supp. 2d 1321, 1345 (N.D. Ga. 2014) (citing *Missouri v. Seibert*, 542 U.S. 600, 608 n. 1 (2004); *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Miranda*, 384 U.S. at 475; *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y.2005); *United States v.* Anderson, 929 F.2d 96, 98 (2d Cir. 1991); United *States v. DeSumma*, 44 F. Supp. 2d 700, 703 (1999)).

The government is correct that "[a]n officer's request for 'routine' information for booking purposes is not an interrogation under *Miranda*, even though that information turns out to be incriminating." *United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991) (internal citation and quotation omitted).  The cases it cites only provide an exception for requests directed to the defendant for information about the defendant, like "name, date of birth, Social Security number, phone number, and educational level." *See United States v. Royal*, 2010 WL 11508453, at *2

(N.D. Ga. June 15, 2010). These cases recognize that officers can ask "questions that are necessary to secure biographical data necessary to complete pretrial or booking services" without the procedural safeguards of *Miranda*. *United States v. Toumasian*, 2011 WL 3738980, at *4 (N.D. Ga. Aug. 22, 2011). The government has not cited to any case extending this exception to questions seeking biographical data about third parties.

The question Hinds put to Lewis was not designed to elicit routine booking information about Lewis himself; he was instead inquiring about the identity of Lewis' girlfriend. At the time, Lewis was handcuffed in the back of the police car after his arrest. Hinds asked him for his "girl's name," and then continued to engage with Lewis, informing him that his girlfriend was also under arrest, and that it was "unfortunate for her." Gov't Exhibit 8. This back-and-forth conversation constitutes more than seeking routine booking information. Hinds sought information from Lewis about his companion and should have known his question and follow-up commentary were likely to elicit an incriminating response. *Innis*, 446 U.S. at 302. The "booking questions" exception to *Miranda* does not apply.

17

The government, therefore, has not borne its burden of showing an applicable exception to *Miranda*, and Defendant's motion to suppress the statements he made after his arrest, but prior to receiving any *Miranda* warnings, should be **GRANTED**.

## 4.   Warrant Application

Lewis finally challenges the search warrant for his DNA.  Doc. 26 at 11-12.  While the parties' briefing on the issue is cursory, it appears that defendant challenges the search warrant under the exclusionary rule based on the alleged Fourth Amendment violations, discussed above. *See id.* at 11 ("The exclusionary rule is used to safeguard the Fourth Amendment of the United States.").[2]  "[T]hree conditions must occur to

---

[2] The defendant also cites to *Franks v. Delaware* for the proposition "[e]vidence [presumably obtained in violation of the Fourth Amendment] may not be used in the government's case in chief under the exclusionary rule."  Doc. 26 at 11 (citing *Franks*, 438 U.S. 154, 170 (1978)).  To the extent this reference to *Franks* was intended to be a challenge to the veracity of the affidavit presented in support of the search warrant, the defendant has not met his burden.  An affidavit presented in support of a search warrant carries "a presumption of validity," *Franks*, 438 U.S. at 171, and any defendant who seeks to offer evidence impeaching the affidavit's factual assertions must meet an "onerous" burden.  *United States v. Daoud*, 755 F.3d 479, 488 (7th Cir. 2014) (Rovner, J., concurring); *United States v. Clenney*, 631 F.3d 658, 663 (4th Cir. 2011) (*Franks* imposes a "rigorous" standard).   Under *Franks*, the defendant is required to make "a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and demonstrate that the allegedly false statement is necessary to the finding of probable cause.  *Franks*, 438 U.S. at 155-56.  The defendant's cursory and conclusory argument that officers gave "a dishonest portrayal of events," doc. 26 at 12, is insufficient to carry such an onerous burden.

warrant application of the exclusionary rule.   First, there must be misconduct by the police . . . ." *United States v. Herring*, 492 F.3d 1212, 1217 (11th Cir. 2007).   As discussed above, the stop and search of the car did not violate the Fourth Amendment, and the defendant does not have a privacy interest in his passenger's purse to challenge its search.   As to the Fourth Amendment argument, then, there is no police misconduct to justify application of the exclusionary rule.

In arguing for the search warrant's suppression, Lewis discusses the officers' "failure to mirandize" him.   Doc. 26 at 12.   To the extent he argues the inclusion of his pre-*Miranda* statements in the search warrant renders it invalid, "*Miranda* does not require the exclusion of physical evidence that is discovered on the basis of a voluntary, although unwarned, statement," *United States v. Jackson*, 506 F.3d 1358, 1361 (11th Cir.2007) (citing *United States v. Patane*, 542 U.S. 630 (2004)).   As the Eleventh Circuit has explained: "While statements made in violation of *Miranda* must generally be suppressed, failure to give *Miranda* warnings does not require suppression of physical fruits of a suspect's unwarned but voluntary statements." *United States v. Robinson*, 760 F. App'x 762, 764 (11th Cir. 2019) (citing *Patane*, 542 U.S. at 633–34, and

*Jackson*, 506 F.3d at 1361); *see also United States v. Manta-Carillo*, 491 F. App'x 125, 127 (11th Cir. 2012) ("[T]he Self–Incrimination Clause in the Fifth Amendment does not bar the admission of physical evidence that is the fruit of an unwarned but voluntary statement.") (citation omitted); *United States v. Phillips*, 468 F.3d 1264, 1266 (10th Cir. 2006) (affirming admissibility of DNA evidence gathered pursuant to a search warrant where supporting affidavit included a statement voluntarily given by the defendant pre-*Miranda* warning).

In determining whether a statement was made voluntarily, courts evaluate "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Those cases where courts have found confessions to be involuntary "have all contained a substantial element of coercive police conduct." *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). Factors considered include the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003). "Sufficiently coercive conduct normally involves subjecting the

accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (internal quotes and citation omitted).

Although Lewis' statements were unwarned, and therefore violative of *Miranda*, considering the totality of the circumstances, they were not involuntarily made. Although he was restrained in the back of the police unit, "[t]he use of handcuffs does not establish coercion." *Shriner v. Wainwright*, 715 F.2d 1452, 1456 (11th Cir. 1983). There is no evidence that Lewis' statements were the result of officers applying physical force or threatening to do so. There is no evidence that any officer made a promise to induce him to make the statements. He did not make the statements at the end of a long, drawn-out interrogation process. Although given before officers properly warned him of his rights, the statements were not involuntary such that the physical evidence obtained through the search warrant is subject to suppression. *See Jackson*, 506 F.3d at 1361; *see also Robinson*, 760 F. App'x at 764 (affirming denial of motion to suppress physical evidence where

unwarned statements were found to be voluntary based on the totality of the circumstances).

Notably, neither party raised the above analysis of the search warrant. This is especially problematic since the government conceded one of the defendant's statements ought to be suppressed; the parties knew prior to the hearing that at least one of the statements contained in the search warrant was deemed *Miranda* violative. In response to the Defendant's argument for suppression of the search warrant, the government argues that, "[e]ven removing the reference to the statement made by Defendant regarding his possession of the gun, there is ample probable cause . . . ." Doc. 27 at 20. It appears the government is relying on the test used in the context of a Fourth Amendment violation. Where police use evidence gathered in violation of the Fourth Amendment to secure a warrant, the Eleventh Circuit applies a two-part test to determine whether the evidence seized pursuant to the warrant is admissible. *United States v. Albury*, 782 F.3d 1285, 1291 (11th Cir. 2015). First, courts must "excise from the affidavit" any unlawfully obtained information and determine whether the remaining information supports a finding of probable cause. *Id.* If the remaining information

supports a probable cause finding, courts must then determine whether the warrant would have been sought absent the unlawful conduct; if so, the evidence seized pursuant to the warrant is admissible. *Id.*

It is not clear that this test applies where the search warrant contains *Miranda* violative statements, as opposed to evidence collected in violation of the Fourth Amendment. The parties' briefing does not clearly articulate which standard should apply. *Compare* doc. 26 *with* doc. 27. As discussed above, based on the Court's own review of Eleventh Circuit precedent and other persuasive authority, it appears the search warrant survives scrutiny because the exclusionary rule simply does not apply. *See, e.g.*, *Jackson*, 506 F.3d at 1361. If, however, the government is right, and the *Albury* test applies, the search warrant remains admissible. Even excising the defendant's two statements from the application, "the remaining information in the affidavit nevertheless supports a finding of probable cause." *Albury*, 782 F.3d at 1291. The record also supports a conclusion that the warrant would have been sought absent the defendant's pre-*Miranda* statements. *Id.* at 1291-92.

Probable cause exists when under the "totality-of-the-circumstances . . . there is a fair probability that contraband or evidence

of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The affidavit in support of the search warrant, absent the defendant's statements, still includes Hinds' observation of a clip, believed to be a holster, on the defendant's hip and the defendant's "extremely agitated" behavior and his denial of any weapon when asked. Doc. 38-3 at 2. It includes a discussion of the defendant's refusal to exit the vehicle for a pat down for weapons, requiring officers to forcibly remove him. *Id.* at 2-3. It provides information about the black plastic holster ultimately found on Lewis' right hip, and the discovery of two loaded extended magazines in the vehicle. *Id.* at 3. It explains the officers' observations of the passenger, including her attempts to access the vehicle after Lewis' arrest, and her defensive and uncooperative responses when Hinds asked her about any weapons. *Id.* It included her refusal to allow Hinds to search her purse. *Id.* It discussed the location of the Glock Model 27 in her purse. *Id.* It also explained that Lewis is a convicted felon. *Id.* at 4.

There is also nothing to suggest that, but-for the defendant's two statements, officers would not have sought the warrant for the defendant's DNA. Officers sought DNA from Lewis "for the purposes of

further DNA testing and comparison to the Glock 27 .40cal Pistol . . . and accompanying magazines . . . in order to confirm whether or not Mr. Lewis possessed the recovered firearm while being a convicted felon . . . ." Doc. 38-3 at 4. The search warrant application discussed prior swabs of the pistol and magazines, "for further DNA testing and comparison purposes." The facts recited by the application supplied probable cause to believe that DNA from Lewis would yield evidence connecting him to the weapon. The circumstances of the traffic stop suggest that the investigation into Lewis' alleged possession of the firearm would have continued, even absent his two statements.

Finally, the government contends that the good faith exception developed in *United States v. Leon*, 468 U.S. 897, 913 (1984) applies to the search warrant. *See* doc. 27 at 20. The defendant argues that it does not. Doc. 26 at 11-12. In *Leon*, the Supreme Court held that officers' objectively reasonable reliance on a warrant removed any practical justification for applying the exclusionary rule. *See* 468 U.S. at 921 (excluding evidence because the executing officer reasonably relied on the issuing magistrate's probable cause determination, "cannot logically contribute to the deterrence of Fourth Amendment violations."). Given

that exception, "searches conducted pursuant to warrants will rarely require suppression." *United States v. Taxacher*, 902 F.2d 867, 871 (11th Cir. 1990).

*Leon* identified four situations where suppression would remain appropriate: (1) where the officer misled the issuing magistrate by intentionally or recklessly including false information in the affidavit, (2) "where the issuing magistrate wholly abandoned his judicial role" by failing to act neutrally, (3) where the "affidavit so lack[s] ... indicia of probable cause as to render official belief in its existence entirely unreasonable," and (4) where the warrant issued is "so facially deficient ... that the executing officers cannot reasonably presume it to be valid." 486 U.S. at 923.

Despite the defendant's assertion that the officers who conducted the stop acted in a way that "went beyond mere mistake," and "failed to properly detail their own failures in their reports, instead giving a dishonest portrayal of events . . . ," doc. 26 at 12, he does not argue that the investigator who actually applied for the warrant, a law enforcement officer not involved in the initial traffic stop, acted intentionally or recklessly to mislead the issuing judge. *See, e.g.*, doc. 38-3 (affidavit and

application for search warrant submitted by Detective Daniel Newman). There has been no argument that any of the other three exceptions to *Leon*'s application apply. *See* doc. 26 at 11-12. Therefore, even if the warrant were found to be tainted by the inclusion of the defendant's two statements, the good faith exception should apply, and suppression of the DNA evidence obtained by the warrant should be denied.

For all of these alternative reasons, Lewis' motion to suppress the search warrant should be **DENIED.**

## III.   CONCLUSION

Lewis' Motion to Suppress should be **GRANTED, in part**, and **DENIED, in part**. Doc. 26. Both incriminating statements he made after his arrest but prior to receiving his *Miranda* warning should be suppressed. The remainder of his Motion to Suppress should be **DENIED**.

This R&R is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and

Recommendations." Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED**, this 9th day of June, 2022.

Christopher L. Ray
United States Magistrate Judge
Southern District of Georgia